**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DARYAO S. KHATRI, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 19-2644 (RBW) |
| ) | |
| BOARD OF TRUSTEES OF THE ) | |
| UNIVERSITY OF THE DISTRICT OF ) | |
| COLUMBIA, ) | |
| ) | |
| Defendant. ) | |

<u>**MEMORANDUM OPINION**</u>

The plaintiff, Daryao S. Khatri, proceeding <u>pro se</u>, brings this civil action against the

defendant, the Board of Trustees of the University of the District of Columbia, asserting a claim

of retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to e-17

("Title VII"). <u>See</u> Complaint ("Compl.") at 1, ECF No. 1-1. Currently pending before the Court

is the Defendant's Motion to Dismiss Plaintiff's Complaint ("Def.'s Mot." or the "defendant's

motion"), ECF No. 6. Upon careful consideration of the parties' submissions,[1] the Court

concludes for the following reasons that it must grant the defendant's motion.

---

[1] In addition to the filings already identified, the Court considered the following submissions in rendering its decision: (1) the Defendant's Notice of Removal ("Def.'s Notice"), ECF No. 1; (2) the Defendant's Memorandum in Support of Its Motion to Dismiss Plaintiff's Complaint ("Def.'s Mem."), ECF No. 6; (3) the plaintiff's Memorandum of Points and Authorities in Opposition to Defendant's Motion to Dismiss ("Pl.'s Opp'n"), ECF No. 7; and (4) the Defendant's Reply Brief in Support of its Motion to Dismiss Plaintiff's Complaint ("Def.'s Reply"), ECF No. 9.

The Court notes that the defendant filed its motion and its memorandum together as part of the same document, which is located on the docket at ECF No. 6. <u>See</u> ECF No. 6 at 1–2 (the defendant's motion); <u>id.</u> at 3–20 (the defendant's memorandum). Because the documents are clearly distinct, with separate cover pages and page numbers, the Court will refer to and cite the documents individually. <u>See, e.g.</u>, Def.'s Mot.; Def.'s Mem.

# I.      BACKGROUND

The following facts are taken from the plaintiff's Complaint, unless otherwise specified.
The plaintiff was a physics professor at the University of the District of Columbia (the
"University") from September 1, 1973, until May 15, 2015, when "he was laid off[.]"  See
Compl. ¶ 1; see also id. ¶ 15 (stating that "[b]efore his termination during the 2014[–20]15
academic year, [the plaintiff] was a tenure reserved-interest status faculty (full-professor rank) at
the University"); Pl.'s Opp'n") at 8–9 (alleging that the plaintiff "was granted [r]eserved
[i]nterest [s]tatus[,]" which is "an alternate term for [t]enure," "during the consolidation of three
separate institutions . . . to form the University" (emphasis omitted)).  The defendant is "charged
with the responsibility of governing the University" and "possesses those powers necessary and
convenient" to do so, "including the power to sue and be sued and to complain and defend in [the
University's] name in [ ] court[.]"  Compl. ¶ 2.

## A.      The Plaintiff's Disputes with the University's Administration Prior to His Termination

Between 1999 and 2014, the plaintiff, independently or as a member of faculty
organizations, engaged in several disputes with the University's administration, including
challenging certain University hiring decisions and filing several Equal Employment
Opportunity ("EEO") complaints.  See id. ¶¶ 9–26.  First, on May 3, 1999, the plaintiff
"challenged [what he perceived to be] an illegal hiring practice" when "[t]he administration
appointed Dr. Beverly Anderson[,]" id. ¶ 17, as a provost, see Pl.'s Opp'n at 13,[2] "without a
formal search[,] as [was] required by the [defendant's] policies" ("the plaintiff's challenge to Dr.

---

[2] The plaintiff attached correspondence related to his challenge to Dr. Anderson's appointment to his Complaint;
however, the copies of the letters attached by the plaintiff are blurry and illegible.  See Compl., Ex. 6.  To the best of
the Court's ability to decipher the letters, it appears that Dr. Anderson was appointed as "Provost and Vice President
of Academic Affairs" at the University.  See id. at 2.

Anderson's appointment"), Compl. ¶ 17.  Thereafter, in "2000 and 2005[,]" the plaintiff "filed

EEO complaints with [the University's human resources office] and [the Equal Employment

Opportunity Commission ("EEOC").]"  Id. ¶ 21.  "During the 2007[–]2008 academic year, [the

plaintiff raised a] challenge[]" when "Graeme Baxter[, who] was appointed as an 'acting'

provost and Vice President of Academic Affairs[,] . . . unilaterally removed the title 'acting'

from her position" ("the plaintiff's challenge to Baxter's title change").  Id. ¶ 18.

On August 18, 2014, the plaintiff received a termination letter from the University

"stat[ing] that [the plaintiff's] employment with the [U]niversity w[ould] end on May 15, 2015."

Id., Exhibit ("Ex.") 9 (Narrative of the EEO Complaint by Dr. Daryao S. Khatri ("Oct. 2014

EEO Compl.")) at 1.  "Upon learning of [his] termination letter, [the plaintiff] asked questions of

a number of other faculty members who might have received similar letters."  Id., Ex. 9 (Oct.

2014 EEO Compl.) at 1.  The plaintiff alleges that "[m]ost of the faculty who received

[termination letters we]re" (1) "above the age of [sixty or sixty-five;]" (2) "foreign[-]born[;]" (3)

"of color[;]" (4) "of different races[;]" and (5) "in [science, technology, engineering, or

mathematics] disciplines[.]"  Id., Ex. 9 (Oct. 2014 EEO Compl.) at 1.

On October 7, 2014, "[t]he Academic Senate Policies and Procedures Committee[

("Faculty Senate"),[3] of which the defendant was a member,] . . . passed [a] motion . . .

request[ing that] the [P]resident's Office and the [defendant] [ ] rescind the permanent

appointment of the [College of Arts and Sciences] dean" by October 31, 2014 ("the October

2014 Faculty Senate resolution").  Id. ¶ 19; see also id., Ex. 7 (Approved Academic Senate

---

[3] It appears from the plaintiff's filings that the "Academic Senate" and the "Faculty Senate" are the same entity.  See
Compl. ¶ 19 (alleging that the "Academic Senate Policies and Procedures Committee . . . passed [a] motion" stating
that "the Faculty Senate request[s] the [P]resident's Office and the Board of Trustees to rescind the permanent
appointment of the CAS dean ASAP, but no later than [October 31, 2014]"); Pl.'s Opp'n at 13 (asserting that "the
Faculty Senate passed a resolution asking the Board to rescind this appointment").  As the plaintiff predominantly
refers to the "Faculty Senate" when describing this resolution, see, e.g., Compl. ¶¶ 19, 20; Pl.'s Opp'n at 13, the
Court will also refer to the "Faculty Senate" in its discussion of the plaintiff's allegations regarding this resolution.

Motion # 2 (Oct. 7, 2014)) at 1.  On October 20, 2014, the plaintiff "filed an EEO complaint with [the University's human resources office's] EEO Officer" ("the plaintiff's October 2014 EEO complaint").  Id. ¶ 22; see id., Ex. 9 (Oct. 2014 EEO Compl.) at 1; see also id., Ex. 10 (Letter from W. Brian Ramsay, EO Officer, Univ. of Dist. of Columbia Off. of Hum. Res., to Dr. Daryao S. Khatri (Dec. 19, 2014) ("Ramsay Letter")) at 1.  The plaintiff's October 2014 EEO complaint alleged that terminations by the University followed a pattern whereby "[m]ost of the faculty who received [termination] notices [were] foreign[-]born[,] . . . of color[,] . . . [and] of different races."  Id., Ex. 9 (Oct. 2014 EEO Compl.) at 1.

On or around November 14, 2014, the University's Faculty Association ("Faculty Association"), an entity that represents the University's full-time faculty "for collective[-]bargaining purposes[,]" id. ¶ 4, "passed a '[n]o-confidence' motion in the Acting Provost, Dr. Rachael Petty" ("the November 2014 no-confidence motion"), id. ¶ 20.  "Because [the plaintiff had been] asked by the leadership of the Faculty Senate and [the Faculty Association] to highlight the events that [we]re taking place at the [University], Dr. Petty appeared to hold [the plaintiff] responsible for" the no-confidence motion.  Id.

On November 10, 2014, the plaintiff filed a grievance "with the . . . Faculty Association" regarding the "decision of Professor Griffin, [the] Division Director for Math and Engineering, not to assign [the plaintiff] two mathematics courses[.]"  Id., Ex. 12 (Letter from Marilyn Hamilton, Acting Dean, Off. of Acad. Affs. (Nov. 26, 2014) ("Hamilton Letter")) at 1.  The plaintiff claimed that Professor Griffin had violated a provision in the Sixth Master Agreement, see id., Ex. 12 (Hamilton Letter) at 1, between the University and the Faculty Association, see id. ¶ 2, stating that "[q]ualified faculty in the department may request to be assigned one [ ] course for which a part-time faculty appointment would have to be made[,]" and that "[t]he University

has discretion whether to grant any such request, although it may not deny such a request for arbitrary and capricious reasons[,]" id., Ex. 12 (Hamilton Letter) at 1.  On November 26, 2014, the Acting Dean of the Office of Academic Affairs informed the plaintiff that she "concur[red] with [Professor Griffin's] decision" because (1) the plaintiff was "not a member of the mathematics department at the University[,]" and therefore the provision did not apply to the plaintiff, and (2) the provision "indicates that such assignments are made at the discretion of the University" and "Professor Griffin [had] determined not to grant [the plaintiff's] request because [the plaintiff] did not have a qualifying degree in [mathematics]."  Id., Ex. 12 (Hamilton Letter) at 2 (emphasis omitted).

On December 19, 2014, the plaintiff was informed that the University's human resources office "completed its investigation into [a] complaint of discrimination that [he] filed against Dr. [ ] Petty."  Id., Ex. 10 (Ramsay Letter) at 1.  And, on January 16, 2015, the plaintiff filed another EEO complaint with the District of Columbia's Office of Human Rights ("the January 2015 EEO complaint").[4]  See id. ¶ 24; id., Ex. 11 (Letter from Albert Santiago, Hum. Rts. Officer, to Dr. Daryao S. Khatri (Jan. 16, 2015) ("Santiago Letter")) at 1.

## B.   The Plaintiff's Disputes with the University's Administration After His Termination

Following his termination from his full-time faculty position in May 2015, the plaintiff continued to teach "no more than two classes per semester in physics on an adjunct basis."  Id. ¶ 31.  Thereafter, on November 27, 2018, the plaintiff filed another EEO complaint ("the plaintiff's November 2018 EEO complaint") with the University's human resources office EEO

---

[4] Although the plaintiff included with his Complaint a letter he received from Albert Santiago, a Human Rights Officer at the District's Office of Human Rights, in response to his January 2015 EEO complaint, see generally Compl.; id., Ex. 11 (Letter from Albert Santiago, Hum. Rts. Officer, to Dr. Daryao S. Khatri (Jan. 16, 2015) ("Santiago Letter")), he did not include a copy of the January 2015 EEO complaint itself, and the substance of the allegations in the plaintiff's January 2015 EEO complaint are unclear from the Santiago letter and the plaintiff's other filings, see generally Compl.; id., Ex. 11 (Santiago Letter); Pl.'s Opp'n.

officer, alleging that he "ha[d] been retaliated against in teaching assignments because of [his] participat[ion] in the discrimination complaints process and opposi[tion to] unlawful employment practice[s]." Id., Ex. 1 (Letter from Dr. Daryao S. Khatri to Evola Bates, Interim EEO/Compliance Officer, Univ. of the District of Columbia (Nov. 27, 2018) ("Nov. 2018 EEO Compl.")) at 2; see also id., Ex. 4 (Exit Letter – Daryao Khatri (May 16, 2019) ("Bates May 2019 Letter")) at 1.  On December 15, 2018, the plaintiff amended his November 2018 EEO complaint to "also include that [he had] been retaliated against" in not being "hir[ed] back in [his] former position because the [U]niversity appear[ed] to have hired back a number of faculty members whose positions were also terminated." Id., Ex. 2 (E-mail from Dr. Daryao Khatri to Evola Bates (Dec. 15, 2018, 6:20 p.m.)) at 1. After reviewing the November 2018 EEO complaint, the University "concluded [on May 16, 2019,] that there [was] not sufficient evidence to support a violation of the University's Anti-Harassment and Discrimination policy under the 'more likely than not' standard set by that policy." Id., Ex. 4 (Bates May 2019 Letter), at 1.

On June 6, 2019, the plaintiff filed a charge of discrimination with the District of Columbia's Office of Human Rights and the EEOC, to which he attached his November 2018 EEO complaint.  See id., Ex. 5 (Charge of Discrimination (June 6, 2019) ("May 2019 EEO Compl.")) at 1, 3.  On July 3, 2019, the EEOC determined that it was "unable to conclude that the information obtained establishe[d a] violation of the statutes." Id. ¶ 13.

## C.     The Procedural History of This Case

On July 31, 2019, the plaintiff initiated this civil action in the Superior Court of the District of Columbia, alleging that the University "retaliat[ed against him] for participating in the discrimination complaints process [and] for opposing any unlawful employment practice[.]" Id. at 1.  On September 4, 2019, the defendant timely removed the case to this Court pursuant to

28 U.S.C. §§ 1441 and 1446.  <u>See</u> Def.'s Notice at 1, ECF No. 1.  The defendant thereafter filed

its motion to dismiss, <u>see</u> Def.'s Mot. at 1, which is the subject of this Memorandum Opinion.

## II.   STANDARD OF REVIEW

A Rule 12(b)(6) motion tests whether a complaint "state[s] a claim upon which relief can

be granted[.]"  Fed. R. Civ. P. 12(b)(6).  "To survive a motion to dismiss [under Rule 12(b)(6)], a

complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

plausible on its face.'"  <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v.</u>

<u>Twombly</u>, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads

factual content that allows the court to draw [a] reasonable inference that the defendant is liable

for the misconduct alleged."  <u>Id.</u> (citing <u>Twombly</u>, 550 U.S. at 556).

In evaluating a motion to dismiss under Rule 12(b)(6), "the Court must construe the

complaint in favor of the plaintiff, who must be granted the benefit of all inferences that can be

derived from the facts alleged."  <u>Hettinga v. United States</u>, 677 F.3d 471, 476 (D.C. Cir. 2012)

(internal quotation marks omitted).  While the Court must "assume [the] veracity" of any

"well-pleaded factual allegations" in a complaint, conclusory allegations "are not entitled to the

assumption of truth."  <u>Iqbal</u>, 556 U.S. at 679.  Thus, "[t]hreadbare recitals of the elements of a

cause of action, supported by mere conclusory statements, do not suffice."  <u>Id.</u> at 678 (citing

<u>Twombly</u>, 550 U.S. at 555).  Also, the Court need not "accept legal conclusions cast as factual

allegations[,]" or "inferences drawn by [the] plaintiff if those inferences are not supported by the

facts set out in the complaint[.]"  <u>Hettinga</u>, 677 F.3d at 476.  The Court "may consider only the

facts alleged in the complaint, any documents either attached to or incorporated in the

complaint[,] and matters of which [the Court] may take judicial notice."  <u>Equal Emp.</u>

<u>Opportunity Comm'n v. St. Francis Xavier Parochial Sch.</u>, 117 F.3d 621, 624 (D.C. Cir. 1997).

In applying the above framework, the Court must be mindful of the fact that the plaintiff is proceeding in this matter pro se.  This appreciation is required because the pleadings of pro se parties are "to be liberally construed, and a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." Erickson v. Pardus, 551 U.S. 89, 94 (2007) (citations and internal quotation marks omitted). Nonetheless, a "pro se complaint, like any other, must present a claim upon which relief can be granted by the [C]ourt."  Crisafi v. Holland, 655 F.2d 1305, 1308 (D.C. Cir. 1981).

### III.    ANALYSIS

Title VII prohibits employers from retaliating against an employee because the employee "has opposed any practice made an unlawful employment practice by [Title VII.]"  42 U.S.C. § 2000e–3(a).  To prove a claim of unlawful retaliation, the complaint must sufficiently allege three elements: "(1) that an employee engaged in statutorily protected activity; (2) that the employee suffered a materially adverse action by the employee's employer; and (3) that a causal link connects the two."  Howard R.L. Cook & Tommy Shaw Found. ex rel. Black Emps. of Libr. of Cong., Inc. v. Billington, 737 F.3d 767, 772 (D.C. Cir. 2013).

The defendant argues that the Complaint should be dismissed pursuant to Rule 12(b)(6) because (1) the plaintiff "failed to allege he engaged in activity protected under Title VII[,]" Def.'s Mem. at 4 (capitalization removed), and (2) the plaintiff "failed to allege a causal connection between any purported protected activity and any adverse action[,]" id. at 9 (capitalization removed).[5]  The plaintiff responds that he "has successfully pleaded that he engaged in activity protected under Title VII[,]" Pl.'s Opp'n at 12 (capitalization removed), and

---

[5] The defendant presents no argument that any adverse action alleged by the plaintiff is not "a materially adverse action" within the meaning of Title VII.  Howard R.L. Cook, 737 F.3d at 772; see generally Def.'s Mem.; Def.'s Reply.

that he "has established a causal connection between any purported protected activity and any adverse action[,]" id. at 15 (capitalization removed).  The Court will address the defendant's arguments in turn.

### A.  Whether the Plaintiff Engaged in a Protected Activity

The defendant first argues that the "plaintiff has failed to allege he engaged in activity protected under Title VII[,]" Def.'s Mem. at 4 (capitalization removed), because "none of the alleged conduct upon which [the p]laintiff relies in support of his retaliation claim rises to the level of 'protected activity' under Title VII sufficient to state a claim for retaliation[,]" id. at 5. In response, the plaintiff argues that he engaged in protected activities because he "was discriminated [against] based on his race, color, and national origin."  Pl.'s Opp'n at 14.

To engage in a protected activity, the plaintiff must show that he opposed "a practice that the employee reasonably and in good faith believed was unlawful under [Title VII]."  McGrath v. Clinton, 666 F.3d 1377, 1380 (D.C. Cir. 2012) (emphasis omitted).  "While no 'magic words' are required, the complaint must in some way allege unlawful discrimination [based on race, color, religion, sex, or national origin.]"  Broderick v. Donaldson, 437 F.3d 1226, 1232 (D.C. Cir. 2006); see also 42 U.S.C. §§ 2000e–2(a)(1), 2000e–3(a).  "By filing a formal complaint of discrimination . . . [a plaintiff] engage[s] in protected activity."  Holcomb v. Powell, 433 F.3d 889, 902 (D.C. Cir. 2006); see also Walker v. Mattis, 319 F. Supp. 3d 267, 271 (D.D.C. 2018) ("Filing a complaint of discrimination . . . plainly constitutes protected activity."); Richardson v. Gutierrez, 477 F. Supp. 2d 22, 27 (D.D.C. 2007) ("It is well settled that Title VII protects informal, as well as formal, complaints of discrimination."); Bell v. Gonzales, 398 F. Supp. 2d 78, 94 (D.D.C. 2005) ("Initiation of EEO counseling to explore whether an employee has a basis for alleging discrimination constitutes protected activity, even in the absence of an unequivocal

allegation of discrimination.").  "But if the practice the employee opposed is not one that could reasonably and in good faith be regarded as unlawful under Title VII, this element is not satisfied."  McGrath, 666. F.3d at 1380.  Therefore, engaging in a protected activity under Title VII means that the plaintiff complained about discrimination based on race, color, religion, sex, or national original, or participated in an investigation, proceeding, or hearing concerning these traits.  See Walker, 319 F. Supp. 3d at 271; see also 42 U.S.C. § 2000e-(3)(a).

The plaintiff sets forth two categories of allegedly protected activity: (1) his challenges to the University's purportedly illegal hiring practices during the period from 1999 to 2014, and (2) his EEO complaints.  The Court will address the two categories in turn.

**1.  The Plaintiff's 1999 to 2014 Challenges to the University's Hiring Practices**

The Court first examines whether the plaintiff's challenges to the University's purportedly illegal hiring practices during the period from 1999 to 2014 (the "1999 to 2014 hiring practices") constitute protected activities.  See Compl. at 9–10.  The defendant argues that the plaintiff's challenges to the 1999 to 2014 hiring practices do not constitute protected activities because the "[p]laintiff's 'complaints' about administrative appointments had absolutely nothing to do with characteristics protected under Title VII, but, rather, concerned internal procedures and appointment decisions."  Def. Mem. at 5.  In response, the plaintiff identifies four actions he took that he argues constitute protected activities: (1) his 1999 challenge to Dr. Anderson's appointment, see Pl.'s Opp'n at 13; (2) his 2008 challenge to Baxter's title change, see id. at 14; (3) the October 2014 Faculty Senate resolution, see id. at 13–14; and (4) the November 2014 no-confidence motion, see id. at 14–15.  The Court begins its analysis by addressing the three actions that it concludes sufficiently allege protected activities— (1) the plaintiff's 1999 challenge to Dr. Anderson's appointment; (2) the October 2014 Faculty Senate resolution; and (3) the November 2014 no-confidence motion—and then will proceed to

address the plaintiff's 2008 challenge to Baxter's title change, which the Court concludes does

not sufficiently allege a protected activity sufficient to support a retaliation claim under Title VII.

### a. The Plaintiff's 1999 Challenge to Dr. Anderson's Appointment

The Court begins with the first alleged protected activity: the plaintiff's 1999 challenge to

"the hiring of Dr. Anderson as a provost[.]"  Id. at 13.  The defendant argues that "[i]t is clear

that [the p]laintiff did not challenge [Dr. Anderson's] appointment[] due to conduct made

unlawful by Title VII[,]" Def. Mem. at 5, because the "[p]laintiff's 'challenge' concerning Dr.

Anderson's appointment [made] absolutely no mention of discrimination because of race, color,

or national origin[,]" Def.'s Reply at 3 (emphasis omitted).  As the defendant correctly notes, see

id., the plaintiff's Complaint does not contain any allegation that he challenged Dr. Anderson's

appointment as discrimination against a protected class in violation of Title VII, see Compl. ¶ 17

(alleging that "[t]he [University] administration appointed Dr. [ ] Anderson without a formal

search as required by the [defendant's] policies" and "this appointment was challenged by [the

defendant] and two other colleagues on May 3, 1999"); see generally Compl. (containing no

further allegations regarding Dr. Anderson's appointment).[6]  However, in his opposition to the

defendant's motion, the plaintiff asserts that he opposed Dr. Anderson's appointment because the

defendant's failure to "advertise[ the position] as expected according to [the defendant's p]olicy"

meant that the plaintiff "could not apply for the position" and that "[t]his was an attempt by the

administration to limit the appointment of a provost to certain individuals of a certain race[,

which was] an act of discrimination because of [the plaintiff's] race, color[,] and national

origin."  Pl.'s Opp'n at 13.  These are explicit allegations that the plaintiff's challenge to Dr.

---

[6] As noted above, the plaintiff attached correspondence related to his challenge to Dr. Anderson's appointment, see generally Compl., Ex. 6; however, the copies of the letters attached by the plaintiff are blurry and illegible.  Having reviewed the letters to the best of its ability, the Court cannot ascertain whether they contain allegations that the plaintiff challenged Dr. Anderson's appointment as discrimination in violation of Title VII.

Anderson's appointment was in opposition to hiring practices "because of . . . race, color, religion, sex, or national origin[,]" in violation of Title VII, 42 U.S.C. § 2000e–2(a).

The defendant argues that the Court should decline to review these allegations because the "[p]laintiff cannot amend his [C]omplaint via his opposition." Def.'s Reply at 3. Although the defendant is largely correct that "[w]here a plaintiff fails to include allegations in [his] complaint, []he may not amend [his] complaint via the briefs in opposition to a motion to dismiss[,]" id. (quoting Williams v. Donovan, 219 F. Supp. 3d 167, 177–78 (D.D.C. 2016)), the plaintiff's pro se status leads the Court to conclude that "all filings by [the plaintiff] should be read together in assessing whether [his C]omplaint[] should be dismissed." Heard v. U.S. Dep't of State, No. 08-02123, 2010 WL 3700184, at *7 (D.D.C. Sept. 17, 2010) (Walton, J.).[7]

_____

[7] In Heard, this member of the Court applied the following four-factor test from Richardson v. United States, 193 F.3d 545 (D.C. Cir. 1999), to determine whether additional claims alleged for the first time in Heard's opposition memorandum were properly before the Court:

> (1) [whether] the plaintiff was a pro se litigant; (2) [whether] the plaintiff could have amended his claim as a right because the defendant had not yet filed a responsive pleading [and the plaintiff had never before sought an amendment]; (3) [whether] the plaintiff recognized the need for and attempted to make a change to his original complaint; and (4) [whether] the lack of evidence showing that the defendant would be prejudiced by a grant to amend the complaint.

Heard, 2010 WL 3700184, at *7 (internal quotation marks omitted); see id. at *7–8 (applying the four-factor test to conclude that "the Court is not persuaded that 'justice . . . requires' that [Heard] be granted leave to further amend his complaint" because Heard had previously amended his complaint (quoting Fed. R. Civ. P. 15(a))). Here, the Court concludes that all four factors of the Richardson test favor "read[ing] all of [the plaintiff's] filings together[,]" Richardson, 193 F.3d at 548. First, the plaintiff proceeds pro se in this case. See Compl. at 1. Second, the plaintiff had not previously sought to amend his Complaint, and although the defendant has now filed its Answer, see Defendant's Answer and Defenses to Plaintiff's Complaint ("Answer") at 1, ECF No. 12, when the plaintiff filed his opposition, the defendant had not yet filed a responsive pleading, compare Pl.'s Opp'n at 1 (indicating that the plaintiff's opposition was filed on October 23, 2019), with Answer at 15 (indicating that the defendant's Answer was filed on April 14, 2021). Third, the plaintiff's additional allegations in his opposition demonstrate that he "recognized the need for and attempted to make a change to his original complaint[,]" Heard, 2010 WL 3700184, at *7, to incorporate his allegations that his challenge to Dr. Anderson's appointment, as well as his participation in the October 2014 Faculty Senate Resolution and the November 2014 No-Confidence Motion, were in opposition to "an act of discrimination because of [his] race, color[,] and national origin[,]" Pl.'s Opp'n at 13. Fourth and finally, like in Richardson, the defendant "has made no argument here that it would [be] prejudiced[,]" Richardson, 193 F.3d at 549, by the Court reading the plaintiff's filings together. See Def.'s Reply. Accordingly, and in light of the "less stringent standard" to which pro se filings are held, Carter v. Dep't of the Navy, 2006 WL 2471520, at *6 (D.D.C. Aug. 24, 2006) (Walton, J.), the Court concludes that it "will read all of the plaintiff's filings together and consider [the plaintiff's C]omplaint in light of his [opposition] to the [defendant's] motion to dismiss[,]" id.

Accordingly, the Court must decline the defendant's invitation to look solely at the allegations raised in the Complaint.  See id. (concluding that "the Court cannot agree with the defendants that the claims first alleged in the plaintiff's opposition memorandum are improperly before the Court" solely because they were raised for the first time in the plaintiff's opposition memorandum); see also Wu Xiaofeng v. Pompeo, No. 15-cv-1040, 2019 WL 1697868, at *6 n.8 (D.D.C. Apr. 17, 2019) (assuming that the plaintiff in that case had "pled claims under Title VII because: (1) the parties both responded in subsequent filings as if Title VII had been pled; (2) filings by pro se litigants should be read together; and (3) pro se complaints should be construed liberally" (internal quotation marks and alterations omitted)).

Therefore, in light of the clear allegations in the plaintiff's opposition that the action he took in opposing Dr. Anderson's appointment was a challenge to "an act of discrimination because of [his] race, color[,] and national origin[,]" Pl.'s Opp'n at 13, the Court cannot agree with the defendant that "[p]laintiff did not challenge [Dr. Anderson's] appointment[] due to conduct made unlawful by Title VII[,]" Def. Mem. at 5, and because the defendant does not argue that, even considering the allegations made in the plaintiff's opposition, the plaintiff's challenge to Dr. Anderson's appointment is not "protected activity" under Title VII, see generally Def.'s Mem.; Def.'s Reply, the Court must deny the defendant's motion to the extent it seeks dismissal of the plaintiff's claim based on his challenge to Dr. Anderson's appointment.

### b.  The October 2014 Faculty Senate Resolution

The Court next turns to the second alleged protected activity—the plaintiff's participation in the October 2014 resolution passed by the Faculty Senate "asking the [defendant] to rescind th[e] appointment" of "a dean [who was selected for the position] without any formal search process."  Pl.'s Opp'n at 13.  Regarding this allegation, the defendant argues that the plaintiff did not participate in the 2014 Faculty Senate resolution "due to conduct made unlawful by Title

VII[,]" Def. Mem. at 5, because the "[p]laintiff's 'challenge' concerning the appointment of the

Dean of [the College of Arts and Sciences] ma[de] absolutely <u>no mention</u> of alleged or perceived

discrimination based on race[,]" Def.'s Reply at 4 (emphasis in original).  However, again, the

Court concludes that it must consider all of the plaintiff's submissions, not merely the allegations

in his Complaint.  See <u>Heard</u>, 2010 WL 3700184, at *7 (noting that "all filings by <u>pro se</u>

plaintiffs should be read together in assessing whether their complaints should be dismissed");

<u>see also</u> <u>supra</u> note 7, at 12.  As he did regarding his challenge to Dr. Anderson's appointment,

the plaintiff includes additional allegations in his opposition.  See Pl.'s Opp'n at 13–14.

Specifically, the plaintiff asserts that when "the [defendant] appointed a dean without any formal

search process[,]" it "discriminated [against the plaintiff] based on his race, color, and national

origin[]" because the defendant "wanted a certain individual of a certain race" and, therefore,

"individuals, like [the plaintiff], who were interested in applying for the position of a dean, could

not apply[.]"  Pl.'s Opp'n at 13–14.  These are allegations of discrimination "on the basis of [ ]

race, color, . . . or national origin[,]" that fall under Title VII.  42 U.S.C. § 2000e–2(b).  Again,

because the defendant makes no argument that, even accounting for these allegations, the

plaintiff fails to state a claim, <u>see generally</u> Def.'s Mem.; Def.'s Reply, the Court must deny the

defendant's motion as to the plaintiff's allegation based on the October 2014 Faculty Senate

resolution.

### c.  The November 2014 No-Confidence Motion

Third, the plaintiff alleges that he "was asked by the leadership of the Faculty Senate and

[the Faculty Association] to highlight the events that [were] taking place at the [University]" as

part of a "[n]o-confidence[] motion in the Acting Provost, Dr. [ ] Petty[,]" which resulted in "Dr.

Petty appear[ing] to hold [the plaintiff] responsible for" the no-confidence motion.  Compl. ¶ 20.

The defendant argues that the "[p]laintiff [did] not allege that [Dr.] Petty made any decisions in

contradiction to Title VII or that the 'no[-]confidence motion' was at all related to conduct made unlawful by Title VII."  Def. Mem. at 6.  Rather, the defendant contends that "the no[-]confidence motion focused on [Dr.] Petty's alleged involvement in salary decisions and decision to use adjunct faculty," and therefore the "[p]laintiff's involvement with the 'no[-]confidence' motion [did] not rise to the level of protected activity."  Def.'s Reply at 5.  However, like his allegations regarding his 1999 challenge to Dr. Anderson's appointment and the October 2014 Faculty Senate resolution, the plaintiff supplemented his allegations in his opposition.  See Pl.'s Opp'n at 14–15.  Specifically, he asserts that that "there [was] a blatant violation of [the] University's policies and mismanagement of [the University's] funds[,]" which "produced [a] tremendous imbalance in the composition of [the] faculty by race, color[,] and national origin[,]" and "severely impacted [the plaintiff] because of his race, color, and national origin."  Id.

Title VII specifically makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation . . . because of such individual's . . . national origin[.]"  42 U.S.C. § 2000e–2(a)(1).  In light of (1) the Court's obligation to read the plaintiff's Complaint and opposition together, see Heard, 2010 WL 3700184, at *7 (noting that "all filings by pro se plaintiffs should be read together in assessing whether their complaints should be dismissed"); see also supra note 7, at 12; (2) the plaintiff's clear allegations in his opposition of discrimination based on race, color, and national origin; and (3) the defendant's failure to raise any argument that these additional allegations fail to state a claim, the Court will also deny the defendant's motion to the extent that it seeks the dismissal of the plaintiff's claim based on the November 2014 no-confidence motion.

### d.  The Plaintiff's 2008 Challenge to Baxter's Title Change

Fourth, the plaintiff alleges that "[d]uring the 2007[ to ]2008 academic year, [he]

15

challenged another illegal hiring practice[,]" when "Graeme Baxter was appointed as an 'acting' provost and Vice President of Academic Affairs[,]" but "unilaterally removed the title 'acting' from her position[.]"  Compl. ¶ 18.  The defendant argues that this action "concerned internal procedures and appointment decisions" that "had absolutely nothing to do with characteristics protected under Title VII[.]"  Def.'s Mem. at 5.  In his opposition, the plaintiff argues that he raised this challenge because he "just believed that it was an illegal move by [ ] Baxter."  Pl.'s Opp'n at 14.

Even under the liberal pleading standard applicable to pro se plaintiffs, the plaintiff has not asserted any facts, see Compl. ¶ 18; Pl.'s Opp'n at 14, from which the Court can infer that the plaintiff opposed Baxter's title change because the plaintiff "reasonably and in good faith believed [it] was unlawful under [Title VII,]" McGrath, 666 F.3d at 1380 (emphasis omitted).  Although the plaintiff alleges that Baxter's title change was an "illegal hiring practice[,]" Compl. ¶ 18, he makes no allegation"—[either] directly or by implication—[that this action had anything to do with] race, gender, or any other motive prohibited by Title VII[,]" McGrath, 666 F.3d at 115.  The Court, therefore, concludes that "there is nothing in [the plaintiff's Complaint or opposition] to suggest that" his challenge to Baxter's title change "had anything to do with opposing a violation of Title VII."  Id.  Accordingly, the Court finds that the plaintiff has not satisfied his pleading burden to establish that he engaged in protected activity under Title VII when he opposed Baxter's title change, and the Court will therefore grant the defendant's motion as to the plaintiff's 2008 challenge to Baxter's title change.

### 2.  The Plaintiff's EEO Complaints

Next, the Court considers the plaintiff's numerous EEO complaints, see Compl. ¶¶ 9–14, 21–27, and whether they constitute protected activity.  The plaintiff asserts that he engaged in protected activity by filing the following EEO complaints: (1) in 2000 and 2005 "with [the

University's human resources department] and [the] EEOC[,]" id. ¶ 21 (the plaintiff's "2000 and 2005 complaints"); (2) the plaintiff's October 2014 EEO complaint to "[the University's human resources department's] EEO Officer[,]" id. ¶ 22; id., Ex. 9 (Oct. 2014 EEO Compl.) at 1; (3) the January 2015 EEO complaint "with [the District of Columbia Office of Human Rights,]" id. at 11; see also id., Ex. 11 (Santiago Letter) at 1; and (4) the November 2018 EEO complaint with the University's human resources department, id. at 25; id., Ex. 1 (Nov. 2018 EEO Compl.) at 1, which was subsequently refiled with the District of Columbia Office of Human Rights,[8] id. at 8–9; id., Ex. 5 (May 2019 EEO Compl.) at 3–4. The defendant argues that "none of these alleged complaints rise[s] to the level of protected activity under Title VII." Def.'s Mem. at 6. The plaintiff does not respond to these challenges in his opposition to the defendant's motion to dismiss.[9] See generally Pl.'s Opp'n. The Court will examine each of the plaintiff's EEO

---

[8] Because the substantive allegations are identical in both the plaintiff's November 2018 EEO complaint and the subsequent refiling of that complaint with the District of Columbia Office of Human Rights, compare Compl., Ex. 1 (Nov. 2018 EEO Compl.) at 1–2, with id., Ex. 5 (May 2019 EEO Compl.) at 3–4, the Court addresses them together for purposes of determining whether the complaints constituted protected activity.

[9] In his opposition, the plaintiff does not explicitly argue that his EEO complaints constituted protected activity under Title VII. See generally Pl.'s Opp'n at 12–15 (presenting argument that he "has successfully pleaded that he engaged in activity protected under Title VII[,]" without any reference to his EEO complaints (capitalization omitted)). Based on this omission, the defendant asks the Court to deem it conceded that the plaintiff's EEO complaints do not constitute protected activity under Title VII. See Def.'s Reply at 5–6.

Although the defendant is correct that "when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded[,]" Hopkins v. Women's Div., Gen. Bd. of Glob. Ministries, 284 F. Supp. 2d 15, 25 (D.D.C. 2003) (Walton, J.) (emphasis added), the Court declines the defendant's invitation to do so in this case for several reasons. First, in his opposition, the plaintiff does argue that a causal connection existed between his EEO complaints and the alleged retaliatory actions. See Pl.'s Opp'n at 16 (referring to the fact that "[t]wo letters were written [by the plaintiff] to the EEOC" demonstrating that "[t]he [U]niversity has been trying to terminate physics faculty for quite a while"); id. at 17–18 (arguing that the plaintiff's reduced teaching load "was a direct consequence of the plaintiff's filing [of] EEOC complaints"). Second, the plaintiff makes clear allegations in his Complaint that "the University retaliated against [him] in violation of . . . Title VII . . . for participating in the discrimination complaints process[,]" Compl. at 13 ¶ 1, and that, "[a]s a result of [his] filing [of] several EEO complaints . . . , the [University] retaliated against [him] by first terminating [his] employment and later on not hiring [him] back[,]" id. ¶ 27 (emphasis omitted). These allegations, when liberally construed as the Court is required to do in cases involving pro se parties, demonstrate that the plaintiff intended to allege a Title VII claim based, in part, on his EEO complaints, and to defend those allegations in his opposition. Therefore, the Court will not deem the protected activity prong conceded as to the plaintiff's EEO complaints. See O'Donnell v. U.S. Agency for Int'l Dev., No. 1:18-cv-03126,

(continued . . .)

complaints in turn.

### a. The Plaintiff's 2000, 2005, and 2015 EEO Complaints

The Court begins with the plaintiff's 2000, 2005, and 2015 EEO complaints, which the Court will address together.  The defendant argues that the "[p]laintiff does not allege that his 2000 and 2005 EEO[ ] complaints[ or his] January 2015 [EEO] complaint . . . were at all related to opposition to discrimination in violation of Title VII[,]" and "[i]ndeed, [the p]laintiff does not plead any facts concerning his alleged activity in 2000 and 2005 or his January 2015 [EEO] complaint."  Def.'s Mem. at 6–7.  The Court agrees with the defendant that the plaintiff has not adequately alleged facts sufficient to demonstrate that his 2000, 2005, and January 2015 EEO complaints were "protected activity" within the meaning of Title VII.

In the plaintiff's Complaint, he alleges that he "filed EEO complaints with [the University's human resources department] and [the] EEOC in 2000 and 2005[,]" Compl. ¶ 21, with no further discussion about the content of these EEO complaints, see generally id. Regarding his January 2015 EEO complaint, the plaintiff alleges that "[a] complaint was filed with [the District of Columbia Office of Human Rights] around the first week in January 2015[,]" id. ¶ 24, with no description of the content of the complaint, see generally id.  Although the plaintiff attaches as an exhibit to his Complaint a letter confirming that "[t]he [District of Columbia] Office of Human Rights [ ] [was] in receipt of [the plaintiff's] Complaint Form[,]" and scheduling an "[i]ntake [i]nterview[,]" the letter itself provides no information regarding the substance of the plaintiff's January 2015 EEO complaint.  Id., Ex. 11 (Santiago Letter) at 1.  The

---

(. . . continued)

2019 WL 2745069, at *1 (D.D.C. July 1, 2019) (stating that "because [the plaintiff] is proceeding pro se and responded to [the defendant's m]otion to [d]ismiss, the Court will not treat [ ] arguments as conceded[]"); Amissah v. Gallaudet Univ., No. 19-679, 2019 WL 2550334, at *3 n.1 (D.D.C. June 20, 2019) (declining to consider unaddressed arguments as conceded).

act of filing an EEO complaint may, by itself, constitute a "protected activity[;]" however, the

EEO complaint must challenge an act made illegal by Title VII.  See Walker, 319 F. Supp. 3d at

271 ("Filing a complaint of discrimination . . . plainly constitutes protected activity." (emphasis

added)); see also 42 U.S.C. § 2000e–(3)(a).  In light of the fact that the plaintiff has pleaded no

facts that demonstrate that his 2000, 2005, and January 2015 EEO complaints related to

discrimination within the meaning of Title VII, the Court is compelled to find that the plaintiff

has not satisfied his burden to plead facts sufficient to establish that his 2000, 2005, or January

2015 EEO complaints constituted protected activities.  See Iqbal, 556 U.S. at 678.

### b.  The Plaintiff's October 2014 EEO Complaint

Second, the Court addresses whether the plaintiff's October 2014 EEO complaint

constitutes protected activity.  The defendant argues that the "[p]laintiff's October 2014 [EEO]

complaint concerned alleged age discrimination[,]" and because "[a]ge is not a protected

characteristic under Title VII[,]" " [the p]laintiff's October 2014 [EEO] complaint . . . [is] not

protected activity under Title VII sufficient to support a retaliation claim."  Def.'s Mem. at 7.

The defendant is correct that (1) the plaintiff's October 2014 EEO complaint contained

allegations that "[t]he former [University p]resident, Dr. Sessoms, publicly called [the

University's] faculty old[,]" Compl., Ex. 9 (Oct. 2014 EEO Compl.) ¶ 3, and (2) "[a]ge is not a

protected characteristic under Title VII[.]"  Def.'s Mem. at 7; see Barot v. Embassy of Republic

of Zambia, 299 F. Supp. 3d 160, 187 n.21 (D.D.C. 2018) ("Title VII does not cover

discrimination on the basis of age[.]").  However, the plaintiff's October 2014 EEO complaint

also alleged a "pattern" in which "[m]ost of the faculty who received [termination] notices"

were, inter alia, "foreign[-]born[,]" "of color[,]" or "of different races[,]" id., Ex. 9 (Oct. 2014

EEO Compl.) ¶ 2.  The defendant makes no argument that the plaintiff's October 2014 EEO

complaint, to the extent it contains these assertions of discrimination based on national origin or race, does not constitute protected activity under Title VII.  See Def.'s Mem. at 7–8. Accordingly, the Court must deny the defendant's motion to the extent that it seeks dismissal of the plaintiff's claim regarding his October 2014 EEO complaint.

### c.  The Plaintiff's November 2018 EEO Complaint

Finally, the Court addresses the plaintiff's November 2018 EEO complaint.  The defendant argues that the plaintiff's November 2018 EEO complaint "do[es] not represent protected activity as a matter of law under Title VII" because the "[p]laintiff [did] not specify what, exactly, he allegedly 'opposed' [in this complaint] or the nature of any of his alleged complaints concerning 'discriminatory act[s].'"  Def.'s Mem. at 8 (fourth alteration in original). For the following reasons, the Court agrees with the defendant that the November 2018 EEO complaint failed to adequately allege protected activity under Title VII.

In the plaintiff's November 2018 EEO complaint, he alleged that he was retaliated against "due to [his] participation in the discrimination complaints process and for opposing unlawful employee practice[s]."  Compl., Ex. 1 (Nov. 2018 EEO Compl.) at 1; see also id., Ex. 1 (Nov. 2018 EEO Compl.) ¶ 1 (asserting that "[s]ince 2014, [the plaintiff has] opposed and filed complaints against the [U]niversity's unlawful discriminatory act[s] and participated in employment discrimination proceedings" and "filed grievances with [the District of Columbia's] Office of [E]mployment [A]gency [ ], [the District's] Office of Human Rights [ ], [the District's] Public Employees Resolution Board[,] and [the District of Columbia] Superior Court"); see also id. ¶ 9 (alleging that the plaintiff's November 2018 EEO complaint asserted "retaliation for participating in the discrimination complaints process or for opposing any unlawful employment practice").

20

These generalized assertions are insufficient to allege protected activity sufficient to support a retaliation claim under Title VII.  To support a retaliation claim under Title VII, the plaintiff must allege that he engaged in either "opposition activity, i.e., opposing 'any practice made an unlawful employment practice by' Title VII" or "participation activity, i.e., making a charge, testifying, assisting, or participating in any manner in an investigation, proceeding, or hearing under Title VII."  Bloom v. McHugh, 828 F. Supp. 2d 43, 58 (D.D.C. 2011) (emphases added).  The plaintiff's generalized assertions—that he acted in response to "discriminatory act[s]" and that he "participated in employment discrimination proceedings[,]" id., Ex. 1 (Nov. 2018 EEO Compl.)—are insufficient to allege that the plaintiff's "complaints" and "participation" were in response to discrimination in violation of Title VII, as opposed to any other source of antidiscrimination law.  See Bloom, 828 F. Supp. 2d at 58 (internal quotation marks and alterations omitted) (noting that "[a] complaint that alleges harassment generally and generically and does not refer to harassment based on a protected category is not protected oppositional activity under Title VII" sufficient to support a retaliation claim).  Moreover, as the defendant correctly notes, see Def.'s Mem. at 8, the plaintiff's November 2018 EEO complaint provides no information regarding the nature of these "discriminatory act[s]" or "employment discrimination proceedings[,]" id., Ex. 1 (Nov. 2018 EEO Compl.); see generally id.; id., Ex. 1 (Nov. 2018 EEO Compl.).  Accordingly, the plaintiff's allegations, which "generally and generically[,]" id., allege "complaints against the [U]niversity's unlawful discriminatory act[s] and participat[ion] in employment discrimination proceedings[,]" with no explanation of the allegedly "discriminatory act[s]" or "proceedings[,]" id., Ex. 1 (Nov. 2018 EEO Compl.) ¶ 1, fail to provide any allegations from which the Court can infer that the plaintiff's November 2018 EEO complaint alleged retaliation based on protected activity under Title VII.  See Bloom,

828 F. Supp. 2d at 58 (concluding that "Bloom [ ] failed to state a claim of retaliation under Title VII" when her "complaint neither alleges that [the] harassment [about which Bloom complained] was based on a protected characteristics nor that Bloom reported it that way").  The Court therefore finds that the plaintiff has not satisfied his burden to plead facts sufficient to establish that his November 2018 EEO complaint constituted protected activity.  See Iqbal, 556 U.S. at 678.

In sum, the Court concludes that the pro se plaintiff has pleaded sufficient facts to establish, at this early stage of the litigation, that he participated in a protected activity for purposes of Title VII only with respect to (1) his 1999 challenge to Dr. Anderson's appointment; (2) the October 2014 Faculty Senate resolution; (3) the November 2014 no-confidence resolution; and (4) his October 2014 EEO complaint.  However, the plaintiff has failed to adequately plead that he participated in protected activity with respect to: (1) his 2008 challenge to Baxter's title change, or (2) his 2000, 2005, January 2015, and November 2018 EEO complaints.

**B.     Whether the Plaintiff Has Established a Causal Nexus Between the University's Allegedly Adverse Actions and His Alleged Protected Activities**

The defendant next argues that the plaintiff's Complaint should be dismissed because the "[p]laintiff has failed to plead the existence of a causal connection between any alleged protected activity and [the] asserted adverse actions."  Def.'s Mem. at 9.  Having concluded that only some of the purported protected activities survive the defendant's motion to dismiss, the Court will limit its causal nexus analysis to those activities, namely (1) the plaintiff's 1999 challenge to Dr. Anderson's appointment; (2) the October 2014 EEO complaint; (3) the October 2014 Academic Senate resolution; and (4) the November 2014 no-confidence motion (collectively, "the plaintiff's protected activities").

"Title VII retaliation claims must be proved according to the traditional principles of but-for causation, . . . [which] requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."  Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 360 (2013).  At the motion-to-dismiss stage, however, a "plaintiff can meet [his or] her prima facie burden of causation simply by alleging that the adverse actions were caused by [his or] her protected activity."  Vance v. Chao, 496 F. Supp. 2d 182, 187 (D.D.C. 2007); see also Rochon v. Gonzales, 438 F.3d 1211, 1220 (D.C. Cir. 2006) (noting that "in order to survive a motion to dismiss, all the complaint has to say is 'the [defendant] retaliated against me because I engaged in protected activity'" (internal quotation marks, citation, and alteration omitted)).  "[I]n the absence of direct evidence[ of causation, ]a plaintiff may show 'that the employer had knowledge of the employee's protected activity, and that the . . . retaliatory personnel action took place shortly after that activity.'"  Doe 1 v. George Wash. Univ., 369 F. Supp. 3d 49, 73 (D.D.C. 2019) (Walton, J.) (alteration omitted) (quoting Cones v. Shalala, 199 F.3d 512, 521 (D.C. Cir. 2000)); see also Hamilton v. Geithner, 666 F.3d 1344, 1357 (D.C. Cir. 2012) (holding that "[f]or purposes of establishing a prima facie case of retaliation, '[t]emporal proximity can [ ] support an inference of causation . . . only where the two events are very close in time[]'").

In his Complaint, the plaintiff alleges three adverse actions: (1) his August 2014 notice of termination and subsequent May 2015 termination ("the plaintiff's termination"), see Compl. ¶¶ 15, 27; id., Ex. 9 (Oct. 2014 EEO Comp.) ¶ 1; (2) the University's "not hiring [him] back as it did for several faculty members who were friends of the administration and whose names were also on the termination list[ ("the University's failure to rehire the plaintiff"),]" id. ¶ 27 (emphasis omitted); and (3) the University's "limit[ing him] . . . to teach no more than two

classes per semester in physics on an adjunct basis[("the plaintiff's adjunct teaching assignments"),]" id. ¶ 31.  In his opposition to the defendant's motion to dismiss, the plaintiff further alleges that the University took actions "to terminate physics faculty[,]" including (1) in 2009, "transferr[ing the] physics program to the computer science program[;] (2) from 2010 to 2012, "tr[ying] to eliminate the physics program[;]" and (3) from 2013 to 2014, "design[ing a] bogus scheme of Vision 2020[]" and "reorganizing programs" ("the University's actions to terminate physics faculty").  Pl.'s Opp'n at 16–17.  The defendant only presents argument on causation grounds regarding two of these alleged adverse actions, namely (1) the plaintiff's termination and (2) the plaintiff's adjunct assignments.  See Def.'s Mem. at 9–13; Def.'s Reply at 6–9.  Therefore, the Court will limit its analysis regarding the causal nexus between the plaintiff's alleged protected activities and adverse actions to these two alleged adverse actions.[10]

**1.  Causal Nexus Between the Plaintiff's Protected Activities and His Adjunct Teaching Assignments**

The Court first addresses whether the plaintiff has adequately asserted a causal nexus between his alleged protected activities and his allegations regarding his adjunct teaching assignments, namely that "[a]djuncts, who [were] never [ ] full-time faculty at [the University] and some of them were not even qualified, were provided [greater] teaching loads[,]" while "the plaintiff, who was [ ] full-time faculty with outstanding evaluations . . . was limited to teach[ing less than half of other adjuncts' loads] between the Spring Semester[s] of 2016 . . . [and] 2018[,]" Pl.'s Opp'n at 18.  The defendant argues that the temporal distance between the

---

[10] Because the defendant fails to present any argument as grounds for the dismissal of the plaintiff's claims that the University's failure to rehire him and the University's actions to terminate physics faculty constitute retaliation under Title VII, see generally Def.'s Mem.; Def.'s Reply, the Court will deny the defendant's motion to the extent that it seeks the dismissal of those claims.

plaintiff's alleged protected activities in 1999 and 2014, and the alleged adverse action of his adjunct teaching assignments from 2016 to 2018, "is simply insufficient to allege a causal connection."  Def.'s Mem. at 11.  The plaintiff responds that "[m]any of the faculty employees[,]" including him, were "<u>tenured</u> professors[,]" and that in "institutions of higher education, the events take place in astronomical units (not in months and years, but sometimes in decades) when dealing with tenured faculty."  Pl.'s Opp'n at 16 (emphasis in original).

As an initial matter, the defendant suggests that temporal spans of more than three months are a <u>per se</u> bar to alleging causation.  <u>See, e.g.</u>, Def.'s Mem. at 11 (arguing that "in order to satisfy the required element of a causal connection, the alleged adverse action must occur shortly after the aggrieved individual engaged in protected activity"); Def.'s Reply at 9 (citing cases suggesting that "three months is the 'outer limit' of [the] temporal requirement under Title VII").  However, the defendant's broad assertion is not supported by the case law.  Although "temporal proximity between an employer's knowledge of protected activity and an adverse personnel action <u>may</u> alone be sufficient to raise an inference of causation[,]" <u>Harris v. Dist. of Columbia Water & Sewer Auth.</u>, 791 F.3d 65, 69 (D.C. Cir. 2015) (emphasis added), "a plaintiff is <u>not obligated</u> to rely on [the] presumption of causation," <u>Vance</u>, 496 F. Supp. 2d at 186 (emphasis added).  Rather, "[a]t this early stage of the proceedings, [the] plaintiff can meet [his] <u>prima facie</u> burden of causation simply by alleging that the adverse actions were caused by [his] protected activity."  <u>Hoskins v. Howard Univ.</u>, 839 F. Supp. 2d 268, 280 (D.D.C. 2012) (Walton, J.) (first alteration in original); <u>see also</u> <u>Doe 1</u>, 369 F. Supp. 3d at 79 (noting that, "at the motion[-]to[-]dismiss stage, the hurdle of alleging a causal link is not a high one"). Moreover, even though "[t]emporal proximity can indeed support an inference of causation" when "the two events are very close in time[,]" <u>Hamilton</u>, 666 F.3d at 1357 (first alteration in

original), "neither the Supreme Court nor [the District of Columbia Circuit] has established a bright-line three-month rule[,]" id. at 1358.  Rather, both courts "have evaluated the specific facts of each case to determine whether inferring causation is appropriate." Id. at 1358.

Here, the Court concludes that the plaintiff's allegations are sufficient to satisfy his burden of alleging a causal link between his protected activities and the alleged adverse action of his adjunct teaching assignments.  In his Complaint, the plaintiff makes specific allegations that, "[i]n retaliation, during the 20[]15[ to ]2018 academic years, the [U]niversity limited [him] . . . to teach[ing] no more than two classes per semester in physics on an adjunct basis[,]" Compl. ¶ 31, and that this constituted "retaliation for participating in the discrimination complaints process or for opposing any unlawful employment practice[,]" id. at 12.  The plaintiff also alleges that the University's reasons for not assigning him additional courses were pretextual.  See, e.g., Compl. ¶¶ 28–29 (alleging that the University "was not able to assign [certain] courses to [the plaintiff] because [he] did not possess a graduate degree in mathematics, a criteri[on] that must be met by all instructors in all disciplines in the Community College[;]" but it "assigned math and chemistry courses to . . . an adjunct professor[] who [did] not have academic degrees in chemistry and math"); Pl.'s Opp'n at 18 (alleging that the University gave "[a]djuncts, who have never been full-time faculty at [the University] and some of [whom] were not even qualified," teaching loads similar to those handled by full-time faculty, i.e., "45[ to ]55 [professional units] per semester[,]" while giving the plaintiff "no more than 13.5 [professional units] between the Spring Semester of 2016 and Spring Semester of 2018").

Additionally, even if the Court limited its analysis of causation to temporal proximity, the plaintiff has alleged that a time span of years—and even decades—between the protected activity and the adverse action is plausible in this case.  Specifically, the plaintiff alleges that "[b]ecause

[he] was a <u>tenured</u> professor, the length of time between a complaint by [him] and the adverse action taken by [the University] could be years." Pl.'s Opp'n at 15 (emphasis in original); <u>see also id.</u> at 16 (alleging that, in the context of "institutions of higher education, the events take place in astronomical units (not in months and years, but sometimes in decades) when dealing with tenured faculty"). Taking these allegations as true, which the Court is obligated to do at this stage of the proceedings, the plaintiff has alleged that his challenge to Dr. Anderson's appointment in 1999 and the alleged adverse action of his adjunct appointments from 2015 to 2018 are plausibly causally connected, in light of the fact that the plaintiff is a tenured professor at an institution of higher education.[11]

Therefore, the Court concludes that the plaintiff has adequately alleged that the adverse action of his adjunct assignments from 2015 to 2018 were caused by his protected activities.

## 2. Causal Nexus Between the Plaintiff's Protected Activity and the Plaintiff's Termination

The Court next considers whether the plaintiff has adequately asserted a causal nexus between his protected activities and his termination. The Court will first analyze the three events that allegedly occurred after the plaintiff was informed that his employment would be terminated—namely, the October 2014 EEO complaint, the October 2014 Academic Senate resolution, and the November 2014 no-confidence motion—and will then proceed to address the

---

[11] The defendant attempts to characterize the plaintiff's allegations regarding tenure as a legal argument that "the causal connection requirement should not apply because he was a 'tenured' professor." Def.'s Reply at 6. Having concluded that it must construe the plaintiff's filings together because of his <u>pro se</u> status, <u>see Heard</u>, 2010 WL 3700184, at *7 (noting that "all filings by <u>pro se</u> plaintiffs should be read together in assessing whether their complaints should be dismissed"); <u>supra</u> note 7, at 12, the Court disagrees. The plaintiff's opposition provides allegations of causation, that, when combined with the allegations in his Complaint, suffice to plausibly allege that his protected activities are causally connected to the two alleged adverse actions. Imposing an across-the-board requirement of a three-month time span between protected activities and adverse actions, as the defendant urges this Court to do, <u>see</u> Def.'s Reply at 7, would contravene the case law, <u>see, e.g.</u>, <u>Hamilton</u>, 666 F.3d at 1357–58 (noting that "neither the Supreme Court nor [the District of Columbia Circuit] has established a bright-line three-month rule"), and would require the Court to ignore the plaintiff's allegations that in the context of "institutions of higher education, the events take place in astronomical units (not in months and years, but sometimes in decades) when dealing with tenured faculty[,]" Pl.'s Opp'n at 15, which the Court cannot do.

plaintiff's 1999 challenge to Dr. Anderson's appointment.

> **a.  The October 2014 EEO Complaint, the October 2014 Academic Senate Resolution, and the November 2014 No-Confidence Motion**

The Court begins with the October 2014 EEO complaint, the October 2014 Academic Senate resolution, and the November 2014 no-confidence motion, all of which allegedly occurred after the plaintiff was first notified in August 2014 of his impending termination in May 2015.  The defendant argues that the plaintiff cannot rely on these purported protected activities in regards to his termination because "all such 'complaints' took place after [the p]laintiff was notified" in August 2014 of his termination.  Def.'s Mem. at 10 (emphasis in original).  Like the causal connection between his protected activities and his adjunct teaching assignments, the plaintiff alleges that the length of time between his protected activity and the adverse action of the University in terminating him would necessarily exceed "three months to a year" because "the University is dealing with tenured faculty members."  Pl.'s Opp'n at 17.  However, the plaintiff presents no argument regarding why adverse actions that happened prior to a protected activity could have been caused by the subsequent protected activity.[12]  See id. at 16–17.  The Court therefore agrees with the defendant.

---

[12] In his opposition, the plaintiff argues that

> defense counsel appears to think that it just happened during 2014.  No, it just did not happen in 2014; it has been going on since 2004 or so.  So, to make a ca[us]al connection of three months to a year is insane in a situation like this where the University is dealing with tenured faculty members.

Pl.'s Opp'n at 17 (emphasis added).  It is unclear from the plaintiff's opposition to what use of the term "it" refers.  To the extent the plaintiff is referring to additional alleged adverse actions, these actions would also pre-date his alleged protected activity in his October 2014 EEO complaint, the October 2014 Academic Senate resolution, and the November 2014 no-confidence motion, and he again provides no argument that adverse actions could be caused by subsequent protected activity.  On the other hand, to the extent that the plaintiff is referring to additional protected activity, he provides no information regarding any such protected activity not already (1) alleged in his Complaint and his opposition, and (2) addressed by the Court above.  Therefore, regardless of the intent of the plaintiff's argument, to the extent this language raises any additional allegations, he fails to state a claim upon which relief can be granted.

As the defendant correctly notes, see Def.'s Mem. at 10–11; Def.'s Reply at 8, "no materially adverse actions taken before [the] date [of the alleged protected activity] could have been <u>because of</u> having engaged in protected activity[,]" <u>Whorton v. Wash. Metro Area Transit Auth.</u>, 924 F. Supp. 2d 334, 351 (D.D.C. 2013) (emphasis in original).  In his October 2014 EEO complaint, the plaintiff alleged that he "received a termination letter from Dr. [ ] Petty, the University's Provost, on August 18, 2014[,] in which she stated that [the plaintiff's] employment with the [U]niversity [would] end on May 15, 2015."  Compl., Ex. 9 (Oct. 2014 EEO Compl.) ¶ 1.  Therefore, the University's decision to terminate the plaintiff occurred, at the latest, on August 18, 2014—prior to the October 2014 EEO complaint, the October 2014 Academic Senate resolution, or the November 2014 no-confidence motion.  Because these three alleged protected activities occurred after the alleged adverse action, the Court concludes that the plaintiff has not adequately alleged that his termination was causally connected to any of these three events.  The Court will therefore grant the defendant's motion to dismiss to the extent that the defendant seeks to dismiss the aspect of the plaintiff's claims that, by terminating him, the defendant retaliated against him in violation of Title VII for his actions in the October 2014 EEO complaint, the October 2014 Academic Senate resolution, and the November 2014 no-confidence motion.

### b.  The Plaintiff's 1999 Challenge to Dr. Anderson's Appointment

Finally, the Court addresses whether the plaintiff has adequately asserted a causal nexus between his 1999 challenge to Dr. Anderson's appointment and his termination.  As the defendant did regarding the plaintiff's adjunct teaching appointments, the defendant argues that the plaintiff's termination occurred "more than fifteen years after he challenged the appointment of Dr. Anderson[,]" and, therefore, is "not sufficient to establish a causal connection as a matter

of law."  Def.'s Reply at 8.

Despite the appeal of the defendant's position, for the same reasons expressed above regarding the causal nexus between the plaintiff's protected activities and his adjunct assignments, the Court concludes at this stage of the proceedings that the plaintiff has adequately alleged a causal nexus between his 1999 challenge to Dr. Anderson's appointment and his termination.  Specifically, the plaintiff alleges that "[a]s a result of [his] . . . opposition to illegal employment practices, the administration retaliated against [him] by [ ] terminating [his] employment[.]"  Compl. ¶ 27.  Because "[a]t this early stage of the proceedings, [the] plaintiff can meet [his] prima facie burden of causation simply by alleging that the adverse actions were caused by [his] protected activity[,]" Vance, 496 F. Supp. 2d at 187, the Court concludes that the plaintiff has adequately alleged that his termination was caused, at least in part, by his 1999 challenge to Dr. Anderson's appointment.[13]

## IV.   CONCLUSION

For the foregoing reasons, the Court concludes that it must grant in part and deny in part the defendant's motion.  Specifically, the Court must grant the motion to the extent that it seeks the dismissal of the components of the plaintiff's retaliation claim regarding (1) his 2008 challenge to Baxter's title change; (2) his 2000, 2005, January 2015, and November 2018 equal employment opportunity complaints; and (3) his October 2014 EEO complaint, the October 2014

---

[13] The Court concludes that it is compelled to deny the defendant's motion to dismiss due to the minimal pleading requirement necessary to satisfy the causal nexus component of a Title VII retaliation claim.  See Vance, 496 F. Supp. 2d at 187 (noting that, at the motion-to-dismiss stage, a "plaintiff can meet [his or her] prima facie burden of causation simply by alleging that the adverse actions were caused by [his or her] protected activity").  However, the plaintiff should appreciate that his burden will be enhanced at subsequent stages of the litigation.  See Univ. of Tex. Sw. Med. Ctr., 570 U.S. at 346–47 (holding that "the proper standard of causation for Title VII retaliation claims . . . requires [a] plaintiff to show 'that the harm would not have occurred' in the absence of—that is, but for—the defendant's conduct" (quoting Restatement of Torts § 431)); Walker, 319 F. Supp. 3d 272 (noting that, to defeat a defendant's motion for summary judgment, a plaintiff must demonstrate that "a reasonable jury could find" "a causal link between a protected activity and the subsequent adverse employment action").

Faculty Senate resolution, and the November 2014 no-confidence motion, to the extent that the plaintiff is alleging that the defendant retaliated against him by terminating his employment in May 2015.[14]

However, the Court must deny the defendant's motion to the extent it seeks dismissal of the following components of the plaintiff's retaliation claim: (1) his 1999 opposition to Dr. Anderson's appointment; (2) his October 2014 EEO complaint, the October 2014 Academic Senate resolution, and the November 2014 no-confidence motion, except to the extent that the plaintiff is alleging that the defendant retaliated against him for these activities by terminating his employment in May 2015; (3) the defendant's failure to re-hire the plaintiff after his termination in May 2015; and (4) the defendant's actions to terminate physics faculty members.

**SO ORDERED** this 11th day of June, 2021.[15]

REGGIE B. WALTON
United States District Judge

---

[14] The Court notes that the defendant fleetingly asserts that it seeks dismissal of the plaintiff's claim "with prejudice." Def.'s Mem. at 13; see also Def.'s Reply at 9. However, the defendant makes no argument that dismissal with prejudice is appropriate in this case. See generally Def.'s Mem.; Def.'s Reply. "Dismissal with prejudice is the exception, not the rule, in federal practice because it operates as a rejection of the plaintiff's claims on the merits and [ultimately] precludes further litigation of them." Rudder v. Williams, 666 F.3d 790, 794 (D.C. Cir. 2012) (internal quotation marks omitted). Therefore, without any argument that such an "exception" would apply in this case—and particularly in light of the plaintiff's pro se status—the Court declines to dismiss any component of the plaintiff's claim with prejudice.

[15] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.